[Cite as *State v. Johnson*, 2018-Ohio-1389.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105612**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ZACHARY JOHNSON

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-608678-A

**BEFORE:** Kilbane, P.J., McCormack, J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** April 12, 2018

**ATTORNEY FOR APPELLANT**

Susan J. Moran
55 Public Square
Suite 1616
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
Maxwell Martin
Eben McNair
Assistant County Prosecutors
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, P.J.:

{¶1} Defendant-appellant, Zachary Johnson ("Johnson"), appeals his convictions for aggravated murder, murder, attempted murder, felonious assault, discharging a firearm at or near a prohibited premises, and having a weapon while under disability. For the reasons set forth below, we affirm.

{¶2} In August 2016, Johnson was charged in a ten-count indictment. Count 1 charged him with aggravated murder. Count 2 charged him with murder. Counts 3, 4, 6, and 7 charged him with felonious assault. Count 5 charged him with attempted murder. Count 8 charged him with discharging a firearm at or near a prohibited premises. Counts 9 and 10 charged him with having a weapon while under disability ("HWWUD").[1]

{¶3} The matter proceeded to a jury trial, at which the following evidence was adduced.[2]

{¶4} On July 5, 2016, Maurio Ayers ("Ayers") was killed in a drive-by shooting on Thornhill Drive in Cleveland. Charles Wright ("Wright"), who lives on Thornhill Drive, was also shot and injured in the incident. Melton Peoples ("Peoples") was visiting with Wright when the shooting occurred. Peoples testified that Ayers stopped by in his car around 8:30 p.m. Peoples and Wright approached the street and stood on the

---

[1]Each of Counts 1-9 carried one- and three-year firearm specifications and a five-year "drive-by shooting" firearm specification.

[2]Both HWWUD counts and the firearm specifications were tried before the bench.

sidewalk talking with Ayers for approximately 15-20 minutes when another vehicle approached. Peoples described the car as a dark grayish, tanish, brownish color. As this vehicle passed, Wright said "[t]hat * * * Zach [Johnson] right there." There were some issues between Ayers and Johnson because Ayers allegedly stole some drugs and money from Johnson.

{¶5} Johnson's car turned back around toward Peoples, Wright, and Ayers. Peoples testified that he observed two or three people in the car with guns pointing out the windows. Peoples then dropped to the ground for safety and was able to avoid injury. He heard approximately six to eight gunshots. Ayers was shot in the back, and Wright was shot in the foot. After the shooting, Ayers told Peoples and Wright that he was going to the hospital and sped away in his car. He subsequently crashed into a nearby church at the corner of Thornhill Drive and Arlington Avenue, where he died of his gunshot wound.

{¶6} Meanwhile, Peoples and Wright ran into Wright's house. Before the police arrived, Peoples fled to his sister's house, but returned to the scene after learning that the shooting was fatal. Both Peoples and Wright spoke to the police.[3]

{¶7} Derrick Miller ("Miller") testified that Johnson confessed to killing Ayers when they were both in county jail awaiting trials in their respective cases. Miller explained that it is common for inmates to discuss the crimes they committed that brought

---

[3]Wright did not testify after asserting his Fifth Amendment right against self-incrimination.

them to jail. He knew both Johnson and Ayers prior to his incarceration. During one of these conversations with Johnson, Johnson told Miller that he murdered Ayers in revenge because Ayers had robbed him of drugs and money.

{¶8} According to Miller, Johnson staged a drug deal in order to come into contact with Ayers to kill him. Johnson allegedly told Miller that he used a machine gun known as a "Mack 90," but the casings found at the scene came from a hand gun. Miller also told a Cleveland detective that Johnson was driving a black BMW that night. Miller admitted that he agreed to testify against Johnson in order to obtain a favorable plea agreement with the state in his own case.

{¶9} The defense called another inmate, Quentin Allison ("Allison"), to testify as a rebuttal witness to Miller's testimony. Allison testified that inmates rarely discuss their cases, especially with strangers, but some inmates "snitch" to get their time reduced. Allison admitted, however, that Johnson is one of his childhood friends.

{¶10} The state presented testimony from DNA and ballistics experts. There was no DNA evidence on the bullet casings found on the scene that linked Johnson to the crimes. Nor was the ballistics expert able to identify any gunshot residue on the victim, which indicated that the muzzle to target distance was not close.

{¶11} The state also presented the testimony of Todd Wiles ("Wiles"), a crime analyst with the Cleveland Police Department. He has been an analyst for 25 years. He has been to both federal and state law enforcement training academies for multiple cell

phone analysis courses and is an active member of the International Association of Crime Analysts. The trial court accepted Wiles to testify as an expert.

{¶12} Wiles testified that cell phone data placed Johnson's cell phone near the crime scene at the time of the shooting. However, Wiles conceded that determining a cell phone's location from cell tower data is not precise because the towers cover an area "roughly a quarter of a mile" in size. As a result, Wiles was unable to pinpoint the exact location of Johnson's cell phone at the time of the shooting. Through the data, Wiles was only able to narrow the range to a particular area.

{¶13} Cleveland Police Detective Arthur Echols ("Detective Echols") testified that Johnson lived at two different addresses, including 1105 Carlyon Road in East Cleveland. Johnson's sister testified that he was living at the Carlyon address at the time of the shooting. Detective Echols estimated that the Carlyon Road address was "a quarter of mile to half a mile away" from the crime scene.

{¶14} Detective Echols attempted to set up a meeting with Wright to conduct an interview, but Wright was uncooperative with the investigation. In order to facilitate a meeting, Detective Echols met with Wright when he was scheduled for a meeting with his parole officer. Detective Echols had generated a photo array, with Johnson as the suspect. As a result of the photo array and Echols's interview with Wright, the police issued an arrest warrant for Johnson.

{¶15} At the conclusion of trial, the jury found Johnson guilty of all charges and the trial court found him guilty of the two HWWUD charges. After merging allied

offenses, the court sentenced Johnson to a total of 31 years to life in prison.

{¶16} Johnson now appeals, raising the following six assignments of error for review.

### Assignment of Error One

The trial court erred in allowing cell phone site testimony as it was both a discovery violation and was not *Daubert* tested. The court also erred in qualifying the state's witness as an expert and admitting his testimony as such, as his conclusions were unreliable and were not within a reasonable degree of scientific certainty.

### Assignment of Error Two

The court violated [Johnson's] right to confrontation and due process when it improperly allowed the admission of incriminating and impermissible hearsay statements.

### Assignment of Error Three

The state failed to present sufficient evidence of the offenses charged.

### Assignment of Error Four

[Johnson's] convictions are against the manifest weight of the evidence.

### Assignment of Error Five

[Johnson] was denied due process and a fair and impartial trial as guaranteed by the 5th, 6th, and 14th Amendments to the U.S. Constitution and Article I Section 16 of the Ohio Constitution based on prosecutorial misconduct.

### Assignment of Error Six

[Johnson] was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution.

### Cell Phone Evidence

**{¶17}** In the first assignment of error, Johnson argues the trial court erred by allowing Wiles to testify as an expert on cell phone analysis. He contends his testimony should have been excluded as a discovery violation and because the court failed to determine whether Wiles's expert testimony was scientifically reliable as required by Evid.R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**{¶18}** We note that "[t]he admission or exclusion of evidence is a matter left to the trial court's sound discretion; therefore, it will not be disturbed absent an abuse of discretion." *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 40, citing *State v. Frazier*, 8th Dist. Cuyahoga No. 97178, 2012-Ohio-1198.

**{¶19}** Under Evid.R. 702, a witness may testify as an expert if: (1) the testimony "either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among laypersons;" (2) the witness "is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;" and (3) the testimony "is based on reliable scientific, technical, or other specialized information[.]"

**{¶20}** In *Daubert*, the United States Supreme Court held that the trial judge has a "gatekeeping" obligation to ensure that scientific testimony is reliable. *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786, 125 L.Ed.2d 469. The *Daubert* Court enumerated several factors courts must consider when determining whether scientific evidence is reliable, which include: (1) whether the theory or technique has been tested; (2) whether it has

been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. *Id.* at 593-594. These factors are intended to assist the trial court in its duty to ensure that expert testimony is based on the scientific method. *Id.* at 590.

{¶21} In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court extended this holding to all testimony based on "technical" and "other specialized" knowledge. The *Kumho Tire* Court emphasized that "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire* at 141. Indeed, when "assessing reliability, the trial court may, at its discretion, consider the *Daubert* factors to the extent relevant." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 118, citing *Kumho Tire*. Furthermore, "[t]he individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *Drummond* at ¶ 113.

{¶22} In support of his argument, Johnson cites to *United States v. Evans*, 892 F.Supp.2d 949 (N.D.Ill.2012). In *Evans*, the prosecution sought to call an FBI special agent to testify about "the operation of cellular networks and how to use historical cell site data to determine the general location of a cell phone at the time of a particular call." *Id.* at 951. The agent used the "granulization" theory and proposed to testify that phone calls placed from the defendant's cell phone could have come from the building where the

victim was held for ransom. *Id.* The court held an evidentiary hearing, pursuant to Evid.R. 702 and *Daubert*, to determine whether the proposed evidence and analysis were admissible.

**{¶23}** The Illinois Federal District Court concluded that the FBI agent was qualified to testify as an expert regarding the operation of cellular networks and the "granulization" theory. *Id.* at 955. The court further concluded that the agent's testimony on the subject is reliable. *Id.* The court, however, held that the agent's "granulization" theory was not reliable because (1) the agent did not account for the factors that can affect whether a cell phone connects to the closest tower or is rerouted to another tower, and (2) the theory has not been subject to scientific testing or formal peer review, and has not gained general acceptance in the scientific community. *Id.* at 956.

**{¶24}** We note that *Evans* is not binding on this court and we previously rejected *Evans* in *State v. Daniel*, 8th Dist Cuyahoga No. 103258, 2016-Ohio-5231. In *Daniel*, we concluded that Wiles's testimony was admissible as lay testimony because it was limited to a review of the defendant's cell phone records and the location of the cellular towers used by the defendant's phone in relation to the crime scene. *Id.* at ¶ 69, 72

**{¶25}** We explained that unlike the FBI agent in *Evans*, Wiles did not testify about "how cellular networks operate" or "the process by which a cell phone connects to a given tower." *Daniel* at ¶ 66. Testimony regarding a comparison of cell phone data records to locations where crimes occurred does not require "'specialized knowledge, skill, experience, training, or education'" regarding cellular networks. *Daniel* at ¶ 69,

quoting Evid.R. 702(B). Therefore, we found that a *Daubert* hearing was not necessary. *Id.*

{¶26} Despite Johnson's argument to the contrary, Wiles did not attempt to explain the science behind how cell phones work or how cell phones connect to cell towers. As the Second District observed, "'the use of cell phone location records to determine the general location of a cell phone has been widely accepted by numerous federal courts.'" *State v. White*, 2d Dist. Montgomery No. 26093, 2015-Ohio-3512, ¶ 28, quoting *United States v. Jones*, 918 F.Supp.2d 1, 5 (D.D.C.2013). *See also Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1204 (8th Cir.2015) (rejecting the contention that evidence regarding the use of historical cell phone data to identify the geographic area in which a phone was located at a given time is inherently unreliable, saying that federal courts have regularly admitted expert testimony regarding this type of evidence); *United States v. Schaffer*, 439 Fed.Appx. 344, 346-347 (5th Cir.2011) (upholding the admissibility of an FBI agent's testimony pinpointing the locations where cellular telephones were allegedly used, based on "his extensive knowledge and experience in the field" and noting that the agent testified that he had used the technique without error on at least 100 occasions and that the FBI had used it successfully at least 1,000 times).

{¶27} Here, even though the state offered Wiles as an "expert witness," his testimony was no different from the testimony he provided in *Daniel*, 8th Dist Cuyahoga No. 103258, 2016-Ohio-5231. Wiles merely compared cell phone records that showed the location of cell towers "hit" by Johnson's cell phone at the time the murder occurred

with the location of the crime scene. Because his testimony was primarily lay witness testimony and he was competent to testify, the trial court properly allowed his testimony regarding Johnson's cell phone activity and location at the time of the murder.

{¶28} Johnson also contends the court erred in allowing Wiles to testify regarding his cell phone data because the state failed to identify him as a witness and failed to produce the cell phone records during discovery. He contends the last minute production of discovery ambushed the defense.

{¶29} On the first day of trial, the state received Johnson's cell phone records and immediately turned them over to defense counsel. The state indicated that it intended to call an expert phone analyst as a witness and present evidence of maps of the area showing the location of cell phone towers in relation to the crime scene. The state also identified new witnesses to its witness list. These witnesses were discovered from Johnson's phone records because they spoke to him on his phone during the relevant time period. The cell phone records, expert witness, maps of the area, and newly identified witness were produced and brought to the court's attention before the jury was sworn in.

{¶30} Defense counsel objected to all evidence related to Johnson's cell phone because it had not been produced in discovery. The trial court offered to continue the trial to allow the defense time to study the records, question the state's new witnesses, and retain a defense expert. The trial court indicated it would continue the trial for a month if necessary. Defense counsel objected to the admissibility of the evidence, but declined the continuance, citing his client's need to finish the trial. The court then proceeded with

trial, and the state presented the cell phone evidence along with Wiles's testimony. Because Johnson chose to proceed with the trial and declined the continuance, he waived any discovery violation.

{¶31} Therefore, the first assignment of error is overruled.

Confrontation

{¶32} In the second assignment of error, Johnson argues the trial court violated his confrontation rights when it improperly allowed the admission of impermissible hearsay statements.

{¶33} The Confrontation Clause of the Sixth Amendment to the United States Constitution preserves the right of a criminal defendant "to be confronted with the witnesses against him." The Confrontation Clause bars the admission of "testimonial hearsay" unless the declarant is unavailable and the accused had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶34} Testimonial statements exist where there is no ongoing emergency and the statements resulted from a police interrogation whose "'primary purpose was to establish or prove past events potentially relevant to later criminal prosecution.'" *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 17, quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In making this "primary purpose" determination, courts must consider "all of the relevant circumstances." *Michigan v.Bryant*, 562 U.S. 344, 369, 131 S.Ct. 1143, 179 L.Ed.2d 93

(2011).  The question is whether, in light of all the circumstances, the primary purpose of the conversation was to create "an out-of-court substitute for trial testimony."  *Id*. at 358.

**{¶35}** Here, Johnson argues his right of confrontation was violated during the testimony of Peoples, Cleveland Police Officer Taara Johnson ("Officer Johnson"), Andrea Ayers ("Andrea"), and Detective Echols.

**{¶36}** With regard to Peoples, Johnson contends Peoples should not have been permitted to testify as to what Wright stated moments before the shooting — "[t]hat * * * Zach right there."  Wright asserted his Fifth Amendment right to remain silent and did not testify at Johnson's trial.  Therefore, he was not subject to cross-examination.

**{¶37}** Peoples's testimony was not that of an interrogating police officer intending to establish past events that might be relevant to a later criminal prosecution.  As a result, this testimony was not testimonial hearsay.  Peoples merely recounted Wright's present sense impression.  This testimony is admissible as an exception to the hearsay rule under Evid.R. 803(1), which provides that "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness."

**{¶38}** With regard to Officer Johnson, she testified that she questioned Wright while he was in the hospital for his gunshot wound.  Wright gave Officer Johnson a description of the vehicle and the shooter, but Officer Johnson never repeated what Wright told her.  When Officer Johnson began to offer hearsay testimony, the state and

the court reminded her not to repeat what other people may have said.   Officer Johnson

testified:

> [STATE]:   Did you try and talk to [Wright], even though you maybe knew some information had already been collected from him?
>
> [OFFICER JOHNSON]:   Yes.
>
> [STATE]:   All right.   And I don't want you to testify as to what he told you.   But what sort of information were you seeking?
>
> [OFFICER JOHNSON]:   We were trying to get more so of a description of the suspect and also a description of the vehicle that was on scene that he had saw.
>
> [STATE]:   And what was his demeanor like, what was his attitude toward you and your questioning?
>
> [OFFICER JOHNSON]:   As soon as we walked in, we told him that we wanted to ask him a few more questions.   He responded with —
> [DEFENSE COUNSEL]:   Objection.
>
> THE COURT:   Sustained.
>
> [STATE]:   So you can't testify to what he told you.   But how about this. Was he — did he want to give you information at that point?
>
> [OFFICER JOHNSON]:   No.
>
> * * *
>
> [STATE]:   And again, without telling us what he told you, did you get some information from him?
>
> [OFFICER JOHNSON]:   Yes.
>
> [STATE]: So you talked about a description of the vehicle, description of a shooter.   Were you able — were you successful in getting some of that information?
>
> [OFFICER JOHNSON]:   Some, yes.

* * *

[STATE]: And as a result of your observations on the scene, as well as your interview with [Wright] and conferring with the members of the homicide unit, did you generate a report?

[STATE]: Yes.

* * *

[STATE]: What sort of information is included in that report?

[OFFICER JOHNSON]: The information that I received from myself and also the information that homicide received.

* * *

[STATE]: Okay. Included in your report, is there a description of the vehicle?
[OFFICER JOHNSON]: Yes.

[STATE]: Is there a description of one of the males who shot?

[OFFICER JOHNSON]: Yes.

[STATE]: Is there a name of one of the males who shot?

[OFFICER JOHNSON]: There was a nickname.

{¶39} Johnson argues the error of allowing this impermissible hearsay was exacerbated when the state indicated in closing argument that Wright told the officers that he (Johnson) was one of the shooters in the drive-by shooting. Officer Johnson, however, did not provide such testimony, and her testimony did not constitute testimonial hearsay. Therefore, there was no violation of the Confrontation Clause.

{¶40} With regard to Andrea, Ayers's mother, Johnson contends that she provided testimonial hearsay. Andrea testified that she spoke with Wright regarding her son's death. Ayers testified:

[STATE]: Why don't you tell us about the following day. Did you meet with [Wright]?

[ANDREA]: Yeah, the following day I guess he wanted to tell me who —

[DEFENSE COUNSEL]: Objection.

THE COURT: Well, why don't we caution [Andrea]. One of the rules in court is that you can't tell us what somebody else said.

[STATE]: We went over the rules a little bit before your testimony * * * about hearsay. You can't talk about what someone else told you, right? So I don't want you to say the words that [Wright] said, right?

[ANDREA]: Right.

* * *

[STATE]: Did [Wright] tell you what happened?

[ANDREA]: Yes.

[STATE]: And without telling us what he said, did he tell you who had done it?

[ANDREA]: Yes.

[STATE]: Did he give you one name or more than one?

[ANDREA]: He gave me [the] first and last name * * * of one person.

[STATE]: Again, [Andrea], I don't want to go into specifics about what he said, but did he tell you how it happened and how [Ayers] died?

[ANDREA]: Yes.

**{¶41}** Although Andrea testified that Wright spoke to her about her son's death, she did not testify what Wright specifically told her. She did not reiterate the name of her son's assailant, nor did she describe the manner of his death. This testimony was not offered to prove the circumstances of Ayers's death, but to explain how the case unfolded. Thus, there was no testimonial hearsay presented by Andrea.

**{¶42}** With regard to Detective Echols's testimony, Detective Echols explained that Wright did not cooperate with the homicide investigation and that he had to "ambush" Wright during his visit with his parole officer in order to get Wright to identify the shooter. Detective Echols testified:

[STATE]: Did [Wright] make a positive identification of the person who —

[DEFENSE COUNSEL]: Objection.

THE COURT: Finish the question.

[STATE]: Did he make a positive identification of the person who he said was involved in this case?

[DETECTIVE ECHOLS]: Yes.

* * *

[STATE]: As a result of the administration of this photo array and your interview of [Wright], did you seek and secure an arrest warrant for [Johnson] on August 3rd?

[DETECTIVE ECHOLS]: Yes.

**{¶43}** Johnson argues that Detective Echols's testimony regarding Wright's identification of him as the assailant in the drive-by shooting constituted testimonial

hearsay in violation of the Confrontation Clause as explained in *Ricks,* 136 Ohio St.3d at 368, 2013-Ohio-3712, 995 N.E.2d 1181. In *Ricks*, the Ohio Supreme Court held that an officer's testimony regarding the out-of-court statements of an alleged accomplice identifying Ricks as the assailant violated the Confrontation Clause when the accomplice did not testify at trial.

**{¶44}** In the instant case, however, Detective Echols only described Wright's identification of a suspect from a photo array. He did not testify to what Wright said, which is what the officer did in *Ricks.* Rather, Detective Echols's testimony explained his conduct while investigating the homicide. Ohio courts have long held that out-of-court statements are admissible to explain the actions of a police officer during an investigation and are not hearsay. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31; *State v. Blevins*, 36 Ohio App.3d 147, 149, 521 N.E.2d 1105 (10th Dist.1987), *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E. 2d 401 (1980) ("where statements are offered to explain an officer's conduct while investigating a crime, such statements are not hearsay").

**{¶45}** Johnson also relies on *State v. Robinson*, 8th Dist. Cuyahoga No. 100126, 2014-Ohio-1624, in support of his argument. In *Robinson*, this court held that a detective's testimony regarding his presence during a witness's identification of a suspect from a photo array was hearsay. *Id.* at ¶ 14. *Robinson* is distinguishable because in the instant case, Detective Echols did not testify as to the results of the photo array, only that it was administered and Wright made a positive identification. Detective Echols's

testimony explained how the police concluded that Johnson was the lead suspect in Ayers's murder case and the attempted murder of Wright.

{¶46} Accordingly, the second assignment of error is overruled.

Sufficiency of the Evidence

{¶47} In the third assignment of error, Johnson argues his convictions are not supported by sufficient evidence.

{¶48} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶49} Johnson's sufficiency argument is based on an attack of Miller's credibility, which is not suitable for a sufficiency argument. Johnson asserts that Miller was biased and motivated to lie against him because the state promised to give him a reduced sentence in exchange for his testimony.

{¶50} Miller testified that Johnson murdered Ayers in retaliation against Ayers for previously robbing Johnson of drugs and money. He further testified that Johnson admitted murdering Ayers. In a sufficiency analysis, we review the evidence in a light most favorable to the state and, therefore, must accept Miller's testimony as true. Miller testified that Johnson confessed to the crimes. As a result, there was sufficient evidence

that Johnson was involved in the drive-by shooting that caused Ayers's death and Wright's injury. Additionally, Peoples testified that Johnson drove the vehicle involved in the drive-by shooting and fired a gun at the victims. Accepting this evidence as true, we must find there was sufficient evidence to support Johnson's convictions.

{¶51} Therefore, the third assignment of error is overruled.

Manifest Weight of the Evidence

{¶52} In the fourth assignment of error, Johnson argues his convictions are against the manifest weight of the evidence.

{¶53} In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. In a manifest weight analysis, the reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v.Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶54} Johnson argues his convictions are against the manifest weight of the evidence because his convictions were based on hearsay evidence, except for Miller's testimony, which he claims was not credible. Johnson further argues the cell phone records did not place him at the crime scene because he lived within a quarter of a mile of the cell tower that recorded his phone activity at the time of the crime.

{¶55} Although Miller's credibility may be questionable, the jury had the opportunity to judge his credibility as a witness, as well as the witnesses that corroborated or contradicted his testimony, and the jury determined that his testimony was credible.

{¶56} Miller's testimony was corroborated by outside sources. Peoples, who witnessed the shooting, testified that Johnson was one of the shooters. Although the cell phone data by itself is not enough to prove Johnson's guilt beyond a reasonable doubt, the cell phone records coupled with Peoples's and Miller's testimony establishes that Johnson was involved in the shooting.

{¶57} Johnson presented Allison to rebut Miller's testimony. In contrast to Miller's testimony that inmates discuss the crimes that got them into jail, Allison testified that inmates rarely discuss their cases, especially with strangers. Allison also stated some inmates "snitch" in order to get their time reduced. Allison testified that Johnson never confessed to any murders or attempted murders in jail to demonstrate that Miller's testimony regarding Johnson's confession was unreliable. However, Allison admitted that Johnson is one of his childhood friends and that he did not want anything bad to happen to him. Therefore, Allison had his own bias in favor of Johnson and against Miller.

{¶58} Accordingly, the fourth assignment of error is overruled.

## Prosecutorial Misconduct

{¶59} In the fifth assignment of error, Johnson argues his constitutional right to a fair trial was violated by prosecutorial misconduct. In support of his argument, he relies

on *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, for the proposition that the prosecutor improperly vouched for Miller's credibility during closing arguments.

{¶60} We note that since defense counsel did not object to the prosecutor's comments, Johnson forfeited all but plain error. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 94, 372 N.E.2d 804 (1978); Crim.R. 52.

{¶61} The test for prosecutorial misconduct in closing argument is "'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v.Hessler*, 90 Ohio St.3d 108, 125, 2000-Ohio-30, 734 N.E.2d 1237, quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

{¶62} In *Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, the Ohio Supreme Court stated that "[i]t is improper for an attorneyto express a personal belief or opinion as to the credibility of a witness." *Id.* at ¶ 117, citing *State v. Williams*, 79 Ohio St.3d 1, 679 N.E.2d 646 (1997). In order to vouch for the witness, the prosecutor must imply knowledge of facts outside the record or place the prosecutor's personal credibility in issue. *Id.*, citing *State v. Keene*, 81 Ohio St.3d 646,1998-Ohio-342, 693 N.E.2d 246. The *Jackson* Court determined that the following comments were permissible arguments regarding a witness's reliability:

> Now, you know, they're [defense counsel] vilifying her. She was badgered. They were belligerent. She had a brutal cross-examination.

She stood up. You know, it's not easy for someone to come in and testify against their brothers. But, apparently she has — she may lead a different life style than most of us, but she has a sense of decency. She knows a little bit of what's right and what's wrong and what's just. She had no motive to lie. No motive. None whatsoever.

*Id.* at ¶ 119. The Court held that these comments did not constitute impermissible vouching for a witness's credibility, explaining that:

The prosecutor did not improperly vouch for Tara's credibility as a witness. The prosecutor merely argued that Tara was a reliable witness and that she lacked any motive to lie. This type of argument is not improper vouching when, as here, the prosecutor is responding to defense counsel's attacks on a witness's credibility and refers to facts in evidence that tend to make the witness more credible. *See State v. Green*, 90 Ohio St.3d [352] at 373-374, 738 N.E.2d 1208. Moreover, defense counsel did not object, and there was no plain error. When viewed in its entirety, the prosecutor's rebuttal argument neither materially prejudiced appellant nor denied him a fair trial. *See State v. Loza*, 71 Ohio St.3d [61] at 78, 641 N.E.2d 1082.

*Id.* at ¶ 120.

{¶63} In the instant case, the prosecutor in this case never spoke about evidence outside the record or offered his own testimony or opinion. With respect to Miller, the prosecutor stated, in relevant part:

Miller, when he was on the stand, he was able to tell the truth without flinching. He answered all the questions including from defense counsel, whether they were embarrassing or not. Yes, I committed identity fraud; yes, I did these other bad things in the past. Yes, I have lied in the past. And yes, your client confessed to me that he committed this murder and shot [Wright] in the foot.

[Miller's] testimony is not what a lying, self-interested witness looks like. If anyone has doubts about his credibility, I will issue you this challenge. This is a challenge to anyone who has any reservations about [Miller's] truthfulness or his credibility. If [Miller] decided that he was going to lie to help himself out, why would he even acknowledge that he heard from his

brother that [Ayers] was dead?  Why wouldn't he say that the first time he got that information as when [Johnson] confessed to him?

And why would he include another independent witness [Allison]? Why wouldn't he just say, you know what, he told me when [Allison] was at a pretrial, or he told it to me when we were both showing at the same time? Why would he include another person to that conversation, who he knows could deny it; especially when he knows that person is [Johnson's] friend, and not just his friend, his childhood friend, who he doesn't want anything bad to happen to him?

{¶64} None of these statements involve evidence or facts outside the record. They all relate to the evidence the jury heard and determined on its own.  Thus, these comments did not constitute inappropriate vouching for Miller's credibility.  Thus, there was no plain error.  When viewed in its entirety, the prosecutor's closing argument neither materially prejudiced Johnson nor denied him a fair trial.  *Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 120.

{¶65} Johnson also argues he was prejudiced by the cumulative effect of other errors.  However, because we declined to find error within each of the prior assigned errors, the cumulative error doctrine does not apply to the instant case.

{¶66} Therefore, the fifth assignment of error is overruled.

Ineffective Assistance of Counsel

{¶67} In the sixth assignment of error, Johnson argues defense counsel was ineffective in the following instances:  (1) failing to secure a continuance on the day of trial when the state presented the new cell phone evidence and secure an independent expert to analyze the results and offer independent testimony; (2) failing to secure a *Daubert* hearing on the reliability of the location triangulation; (3) failing to object to

several instances of inadmissible hearsay and failing to object to improper arguments made by the state during closing argument; and (4) failing to request a competency evaluation.

**{¶68}** To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

**{¶69}** In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Strickland* at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

**{¶70}** Johnson argues the state's case was "constructed entirely of circumstantial evidence, impermissible hearsay, and unreliable testimony." He argues the cell phone evidence was vital because there was no physical evidence linking him to the crime.

**{¶71}** We note the Ohio Supreme Court has stated that "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993), citing *State*

*v. Thompson*, 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987). Where the record does not indicate what kind of testimony an expert witness could have provided, the issue of whether counsel was deficient in failing to secure a defense expert is "purely speculative." *State v. Madrigal*, 87 Ohio St.3d 378, 390-91, 2000-Ohio-448, 721 N.E.2d 52. Likewise, in the instant case, it is mere speculation whether an expert could have refuted Wiles's findings.

{¶72} Moreover, trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). "'[T]he fact that there was another and better strategy available does not amount to a breach of an essential duty to [one's] client.'" *State v. Garcia*, 8th Dist. Cuyahoga No. 102546, 2016-Ohio-585, quoting *Clayton* at 49. Here, defense counsel specifically referred to "trial strategy" when deciding to decline the trial court's offer of a continuance on the day of trial. Based on the foregoing, we cannot say that defense counsel was ineffective for failing to obtain an expert to refute the cell phone evidence, request a continuance, or request a *Daubert* hearing.

{¶73} Johnson next argues that defense counsel was ineffective for failing to object to testimony offered by Officer Johnson and Andrea. He also claims defense counsel was ineffective for failing to object to impermissible arguments made by the state during closing arguments.

{¶74} We note, that defense counsel did object during both Officer Johnson's and Andrea's testimony. The trial court sustained an objection by counsel when Officer Johnson began to testify as to what Wright said. Defense counsel also objected during Andrea's testimony when she began to testify as to her conversation with Wright. Moreover, having found that this evidence was admissible, we cannot find defense counsel ineffective.

{¶75} With regard to closing arguments, Johnson claims trial counsel failed to object to the state's comments that Wright told Andrea that Johnson murdered her son. Specifically, the state said, "[Wright] tells [Andrea] who did the shooting, the one name that he knows." The context of the statement was that the evidence consistently pointed to Johnson as the shooter. The state did not say that Wright specifically told Andrea that Johnson murdered her son. Defense counsel was not ineffective based on the context of this statement.

{¶76} Lastly, Johnson argues defense counsel was ineffective for failing to request a competency evaluation when a 2010 test revealed that his IQ score was a composite of 40. Johnson does not allege that he was incompetent at the time of trial, but rather that defense counsel was ineffective for not requesting an evaluation. There was nothing in the record to suggest that Johnson's mental health in any way affected his ability to assist in his own defense. *See State v. Lewis*, 8th Dist. Cuyahoga No. 90101, 2008-Ohio-2935 (where we rejected a claim of ineffective assistance of counsel stemming from an alleged failure to raise the issue of the defendant's competency). The record suggests that he

understood the proceedings when engaged in a conversation with the trial court regarding the waiver of his right to a jury trial on certain counts and specifications.

**{¶77}** Because appellant has failed to demonstrate any deficiencies in the representation he received, we decline to find that he received ineffective assistance of counsel.

**{¶78}** Accordingly, the sixth assignment of error is overruled.

**{¶79}** Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, PRESIDING JUDGE

TIM McCORMACK, J., and
EILEEN T. GALLAGHER, J., CONCUR